UNITED STATES of America, Plaintiff–Appellee,

v.

Bonnie BRIERTON, Defendant–Appellant.

No. 98–1177.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1998.

Decided Jan. 21, 1999.

As Corrected on Grant of Rehearing March 25, 1999.

and related conduct "substantially jeopardized the safety and soundness of a financial institution," a finding that resulted in an offense level of 24, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2F1.1(b)(6)(A). The district court also added a two-level increase for "abuse of a position of trust," pursuant to U.S.S.G. § 3B1.3, bringing her offense level to 26. The court sentenced Brierton to 63 month's imprisonment (the bottom of the offense level range), a $4,000 fine, and restitution in the amount of $315,851.49.

On January 20, 1998, Brierton filed her appeal, challenging the district court's sentencing determinations and the restitution order. We affirm in part and remand in part.

Stephen P. Sinnott (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, Peggy A. Lautenschlager, Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Steven C. Underwood (argued), Rana Kang, Neider & Boucher, Madison, WI, for Defendant–Appellant.

Before BAUER, MANION, and EVANS, Circuit Judges.

BAUER, Circuit Judge.

From August 1988 to August 1996, Bonnie Brierton was the president of Thorogood Credit Union ("Thorogood"), located in Marshfield, Wisconsin. On October 3, 1997, Brierton pleaded guilty to a one-count superseding information charging that on or about December 31, 1995, she knowingly made false entries in Thorogood's books, reports or statements with the intent to deceive auditors, in violation of 18 U.S.C. § 1006. Specifically, the information charged Brierton with creating a fictitious loan to cover up the existence of an account with a negative balance of $31,269.11.

At Brierton's sentencing hearing, the district court determined that Brierton's offense

## I.  Background

In 1996, while reviewing a loan maintenance log, a Thorogood loan officer became suspicious that Brierton had changed the origination dates on numerous 1995 loans (the "loans"). Specifically, the loan officer noticed that the origination dates on these loans had been changed from 1995 to 1994, a change that would remove the altered loans from a credit examiner's report on 1995 loans. Thus, an examiner reviewing new loans made in 1995 might easily overlook the existence of these loans; a computer search performed for new loans made in 1995 would not find the altered loans.

Shortly after the Thorogood loan officer learned of this possible impropriety, she notified Thorogood's bond underwriter of the problem. Pursuant to the tip, an audit of Thorogood was conducted, which revealed evidence that Brierton was fraudulently altering loans and falsifying other financial records at the credit union. In August 1996, Brierton resigned as president of Thorogood.

Just over one year later, on October 3, 1997, Brierton entered into a plea of guilty to falsifying federal credit union documents. Three issues remained for resolution at the sentencing hearing: 1) the amount of loss

caused by the offense of conviction and the relevant conduct; 2) whether Brierton's criminal conduct "substantially jeopardized the safety and soundness" of Thorogood; and 3) the amount of restitution, if any, Brierton must pay to Thorogood.

During the two-day sentencing hearing, the Government presented evidence that Brierton altered numerous documents while president of Thorogood, including loan origination dates, interest payment due-dates, loan due-dates, and account names. Similarly, the Government offered evidence regarding Brierton's falsification of employee verification forms, which were then used to improve the appearance of Thorogood's debt collateral. The Government also offered evidence that Brierton created fictitious loans, submitted fraudulent insurance claims, falsified a $500,000 certificate of deposit, misapplied credit union funds to benefit family members, and attempted to obtain loan files after she had resigned from Thorogood.

At the end of the sentencing hearing and in its Statement of Reasons, the district court concluded that Brierton's offense of conviction and related conduct "substantially jeopardized the safety and soundness" of Thorogood. Basing this conclusion on the overwhelming evidence presented by the Government, the district court further noted that "had it not been for ... [Brierton resigning] and the installation of a new president, the credit union faced a real danger of closing or going into receivership."

The court's Statement of Reasons sets forth Brierton's sentence calculation. The court's restitution order sets forth restitution to Thorogood in the amount of $315,851.49, which we presume is based on the Government's Summary of Loss and Restitution figures.

## II. Discussion

Brierton raises four issues on appeal. First, Brierton argues that the district court erred by including irrelevant transactions in estimating Thorogood's financial loss. Second, Brierton argues that the district court erred in finding that her conduct "substantially jeopardized the safety and soundness" of Thorogood. Third, Brierton argues that U.S.S.G. § 2F1.1(b)(6)(A)—requiring a court to determine whether an offense "substantially jeopardized the safety and soundness of a financial institution"—is unconstitutionally vague. Finally, Brierton argues that district court's restitution order was excessive and should be vacated.

### A. Relevant Conduct and Financial Loss to Thorogood

■ Brierton argues that the district court erred by including irrelevant transactions in estimating the financial loss caused by her conduct. In the plea agreement however, Brierton acknowledged her understanding that all relevant conduct, as defined by U.S.S.G. § 1B1.3 would be considered by the sentencing judge in determining the appropriate Guideline range and resulting sentence. As an initial matter, we note that the district court's determination of the amount of financial loss did not affect Brierton's sentence. Rather, the offense level stems from the district court's finding that Brierton "substantially jeopardized the safety and soundness" of Thorogood—a finding we confront more thoroughly *infra*.[1] Nonetheless, we will discuss the immediate issue, limiting our discourse to whether the district court correctly determined that other relevant conduct should have been considered for purposes of sentencing.

---

1. Pursuant to U.S.S.G. § 2F1.1, the offense level calculation for offenses involving fraud or deceit begins with a base level offense of 6. The base level is then increased as the amount of loss to the financial institution increases. If, however, the district court determines that the defendant's offense "substantially jeopardized the safety and soundness of a financial institution," *see* § 2F1.1(6)(A), then the offense level is increased to level 24. This was precisely the finding of the district court.

We review challenges to a district court's sentencing decision using a deferential standard. *United States v. Nunez*, 958 F.2d 196, 198 (7th Cir.1992). To the extent the sentencing decision involves questions of fact, we will not disturb the district court's findings unless we have a definite and firm conviction that a mistake has been made. *Id.* A district court's determination that certain behavior amounts to "relevant conduct" for sentencing purposes under the Guidelines is a factual finding, and thus, only will be disturbed if it is clearly erroneous. *Id.* (internal citations omitted).

Sentencing Guideline § 1B1.3, entitled "Relevant Conduct (Factors that Determine the Guideline Range)," provides, in pertinent part, that for offenses involving fraud or deceit, the district court should determine the base level offense for sentencing purposes by considering: (1) "all acts and omissions ... that occurred during the commission of the conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," U.S.S.G. § 1B1.3(a)(1); and (2) "all acts or omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction," U.S.S.G. § 1B1.3(a)(2). Application Note 9(A) to § 1B1.3(a)(2) defines offenses that are part of a "common scheme or plan" as those that are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*."

In this case, Brierton claims that the host of financial transactions considered relevant conduct by the district court are, in fact, irrelevant and therefore should not have been used to enhance her sentence. We do not agree with Brierton's contentions. Instead, we agree with the district court that the financial transactions contested here fall within both § 1B1.3(a)(1) and § 1B1.3(a)(2). Although Brierton pleaded guilty to the single-count offense of falsifying Federal Credit Institution Entries, Reports, and Transactions, the record clearly shows that she also: (1) created fictitious loans and falsified other loan documents and certificates of deposits to conceal the declining financial status of the credit union from Thorogood's board; (2) surreptitiously applied for, and directed proceeds of, life insurance proceeds she knew Thorogood issued without knowledge of the impropriety; and (3) misapplied Thorogood funds by waiving fees and making disbursements to friends and family. All of the financial transactions Brierton contests as irrelevant conduct fall within one of the foregoing categories of conduct, which are most certainly relevant conduct to Brierton's offense of conviction. All of the financial transactions have common factors to the offense of conviction and therefore, demonstrate a "common scheme or plan," as defined in U.S.S.G. § 1B1.3(a)(2). For example, Thorogood was the victim common to all the foregoing transactions. The transactions had the common purpose of concealing from Thorogood its declining financial condition due to Brierton's surreptitious and bad faith financial practices. Moreover, Brierton acted with one *modus operandi*—she manipulated credit union funds to cloak her illegal and bad faith business transactions. Accordingly, we find that the district court did not commit error in determining the nature and extent of Brierton's related conduct while sentencing her.

### B. The Court's Finding of Substantial Jeopardy of Insolvency

Brierton contends that the district court erred by finding that her offense placed Thorogood's safety and soundness in substantial jeopardy, and by accordingly increasing her offense level pursuant to § 2F1.1(b)(6)(A). We review a district court's interpretation and application of the Sentencing Guidelines *de novo* and its findings of fact for clear error. *United States v. Mattison*, 153 F.3d 406, 412 (7th Cir.1998).

In no uncertain terms, Brierton alleges that the district court erroneously relied on the net capital ratio[2] statistics as the sole basis for concluding that she substantially jeopardized the safety and soundness of Thorogood. Brierton then offers a host of reasons why Thorogood's low net capital ratio, as it existed at the time of her resignation in August 1996, was the result of many factors beyond her control and, therefore, was an improper gauge to determine whether Brierton placed Thorogood in substantial jeopardy of insolvency.

After reviewing the district court's Statement of Reasons and the sentencing transcript, however, we find that Brierton has misconstrued the district court's findings. The district court did not, as Brierton suggests, use the net capital ratio as the sole factor in determining whether she placed Thorogood in substantial jeopardy of insolvency. True, the district court's Statement of Reasons refers to the existence of a low net capital ratio as a basis for its conclusion, but it also specifically cites to the "improper transactions, risky loans, falsification of documents and concealment of material information from the credit union board" as bases for determining that Brierton placed Thorogood in substantial jeopardy of insolvency. These same determinations are reiterated in the sentencing transcript. Brierton's argument fails to show that the district court erred.

Brierton also asserts the district court should not have concluded that Thorogood was in substantial jeopardy of insolvency because the evidence presented at the sentencing hearing suggested that Thorogood was not actually insolvent at the time Brierton resigned. Unfortunately for Brierton, the commentary to U.S.S.G. § 2F1.1(b)(6) provides:

> An offense shall be deemed to have "substantially jeopardized the safety and soundness of a financial institution" if, as a consequence of the offense, the institution became insolvent; substantially reduced benefits to pensioners or insureds; was unable on demand to refund fully any deposit, payment, or investment; was so depleted of its assets as to be forced to merge with another institution in order to continue active operations; or was placed in substantial jeopardy of any of the above.

U.S.S.G. § 2F1.1(b)(6), (n.15). This application note lists several types of damage flowing from the offense that may be deemed to substantially jeopardize the safety and soundness of a financial institution, only one of which is insolvency. It reasonably follows that actual insolvency is not required when determining whether an offense substantially jeopardized the safety and soundness of a financial institution, pursuant to § 2F1.1(b)(6). *United States v. Bullard*, 13 F.3d 154, 158 n. 10 (5th Cir.1994). Accordingly, we reject Brierton's argument.

### C. Vagueness Challenge to U.S.S.G. § 2F1.1(b)(6)(A)

Section 2F1.1(b)(6)(A) provides that if the offense "substantially jeopardized the safety and soundness of a financial institution," the offense level shall be increased to 24, which is an offense level significantly higher than the offense level that would have been used had the district court determined that this guideline provision did not apply. Brierton contends that this section is unconstitutionally vague because it "does not provide sufficient definition or clarity to allow courts to define this term with consistency."

The vagueness doctrine holds that a person cannot be held liable for conduct he could not reasonably have been expected to know was a violation of law. "It is well-settled that, as a matter of due process, a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute, or is so indefinite that it encourages arbitrary and erratic arrests and convictions is void for vagueness." *Colautti v. Franklin*, 439 U.S. 379, 390, 99 S.Ct. 675, 58 L.Ed.2d

---

**2.** Put simply, net capital ratio is a company's net capital divided by that company's total assets. It can also be defined as the maximum ratio of indebtedness to liquid capital.

596 (1979) (internal citations omitted). Certainly, the vagueness doctrine presumes a law that attempts to proscribe or prescribe conduct. We are mindful, however, that unless First Amendment freedoms are implicated, a vagueness challenge may not rest on an argument that the law is vague in its hypothetical applications, but instead the challenger must show that the law is vague as applied to the facts of the case at hand. *Chapman v. United States*, 500 U.S. 453, 467, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991).

■■■■ The Guidelines do not establish the illegality of any conduct. Rather, they are "directives to judges for their guidance in sentencing convicted criminals, not to citizens at large." *United States v. Wivell*, 893 F.2d 156, 160 (8th Cir.1990). In other words, the Guidelines are designed to assist and limit the discretion of the sentencing judge. *United States v. Macias*, 930 F.2d 567, 571–72 (7th Cir.1991). It is settled that, with the exception of capital cases, a defendant has no constitutional right to such directives. *Lockett v. Ohio*, 438 U.S. 586, 603, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (finding that "legislatures remain free to decide how much discretion in sentencing should be reposed in the judge or jury in noncapital cases"). As such, the Guidelines are not susceptible to attack under the vagueness doctrine. Since there is no constitutional right to sentencing pursuant to the Guidelines, the discretionary limitations the Guidelines place on the sentencing judge do not violate a defendant's right to due process by reason of vagueness. *Wivell*, 893 F.2d at 159–60. We reject Brierton's argument that U.S.S.G. § 2F1.1(b)(6)(A) is unconstitutionally vague.

## D. The Court's Restitution Order

■■■■ Brierton also contends that the district court improperly calculated the amount of restitution she must repay to Thorogood. We review the amount of restitution ordered by the district court for an abuse of discretion. *United States v. Yoon*, 128 F.3d

515, 529–30 (7th Cir.1997). The federal criminal code requires the sentencing judge to order a convicted defendant to "make restitution to any victim of" the offense of conviction. 18 U.S.C. § 3663A(a)(1). The proper amount of restitution is the amount wrongfully taken by the defendant. 18 U.S.C. § 3663A(b)(1)(B); *United States v. Sapoznik*, 161 F.3d 1117, 1121–22 (7th Cir.1998). Unlike the Guidelines, which permit the court to consider actual or intended loss for the purposes of determining the sentencing level, (*see* U.S.S.G. § 2F1.1), 18 U.S.C. § 3663A requires an award of restitution to be based on the amount of loss actually caused by the defendant's offense. *Messner*, 107 F.3d at 1455. The Government has the burden of proof in determining the amount wrongfully taken by the defendant. 18 U.S.C. § 3664(e); *United States v. Menza*, 137 F.3d 533, 537 (7th Cir.1998).

Here, there seems to be a problem with the sentencing court's calculation of loss. It appears that the court totaled the losses from the offense of conviction and the losses from the related conduct in arriving at the restitution sum. The sentencing court attributed all of the financial loss from Brierton's related conduct to arrive at the restitution figure. This is problematic; our review of the record shows that the Government did not prove by a preponderance of the evidence, as required by 18 U.S.C. § 3664(e), that Brierton was responsible for all the loss in the financial transactions that resulted from her related conduct. In fact, some of the financial losses clearly were not Brierton's sole responsibility, but only were considered as part of her related conduct when she attempted to cover up the existence of those losses. We therefore hold that the district court abused its discretion in awarding restitution for the full amount of these financial transactions.

On remand, the court should recalculate the restitution order, basing the amount of restitution solely on losses actually caused by the defendant's offense. *Messner*, 107 F.3d at 1455. We reiterate that the Government bears the burden to demonstrate the actual amount of loss.

### Conclusion

For the foregoing reasons, we affirm Brierton's sentence and deny her constitutional challenge to the Sentencing Guidelines but vacate the district court's restitution order and remand it for a determination not inconsistent with this opinion.